## TIM SULLIVAN v. STATE BANK OF MORTON AND ANOTHER.[1]

January 10, 1930.

No. 27,548.

[1]Reported in 228 N. W. 603.

*Freeman & Smith* and *D. F. Nordstrom,* for appellants.
*Daly & Barnard* and *Johnson & Hoel,* for respondent.

HOLT, J.

Appeal from the order denying defendants' motion for a new trial.

Plaintiff brought this action against the State Bank of Morton and A. J. Veigel as commissioner of banks to recover $450 paid for three shares of bank stock and also to cancel and annul the stock. There were findings and conclusions of law that plaintiff was not entitled to recover the money paid for the stock, but that he have judgment restraining the enforcement of a stockholder's liability and that upon surrender of the three shares they be forever canceled. Upon this appeal defendants of course do not question the finding or conclusion that plaintiff is not entitled to any money judgment against them.

Before taking up the assignments of error upon which this appeal must be determined a brief summary of the facts in the case is advisable. The bank, with a capital of $25,000 represented by 250 shares of $100 each, had been doing business for many years when on April 8, 1925, it was taken over by the commissioner of banks for liquidation because of insolvency. On November 9, 1925, a reorganization was effected with the approval of the commissioner. The reorganization was accomplished by issuing 250 shares of new stock of the par value of $100 a share and disposing of the same at the price of $150 a share, the 250 shares of old stock being all surrendered and canceled. The creditors representing 90 per cent of the total amount of the claims against the old bank executed an agreement under which they reduced their claims one-half and agreed to take certificates of deposit therefor, payable in three annual payments of one-third each. Those having checking accounts, demand deposits, etc. made the same reduction and agreed

to draw no more than 10 per cent thereof in any one month. From the bills receivable $117,000 deemed collectible was turned over to the reorganized bank, and so was the $37,500 realized from the sale of the newly issued stock, together with $21,000 realized from bills receivable during the commissioner's custody. The remainder of the bills receivable, about $113,000, were turned over to the bank as a trust fund for the benefit of the creditors who reduced their claims as stated. The reorganized bank thereupon opened and conducted business until February 23, 1926, when at the instance of its officers it was taken over by the commissioner of banks and is still in his hands for liquidation.

This finding of fact is challenged as contrary to the evidence:

"That the reorganized bank incurred no debts, but that all of the debts of the bank as reorganized were contracted prior to its reorganization; that while the reorganized bank was open and transacted business none of its assets or resources were in the least impaired, and that the assets taken over by the reorganized bank were not diminished or deteriorated in value by the closing of the bank, and that the depositors and unsecured creditors of the bank in no way suffered any damage whatever by reason of the reorganization, reopening or closing of the bank, but on the contrary they profited thereby in not less than the sum of $37,500, being the amount paid into the bank for the new stock."

Evidently upon that finding is predicated the conclusion of law here attacked, that the stock be canceled and defendants enjoined from enforcing plaintiff's stockholder's liability thereon.

The learned trial court seems to us to have reached inconsistent results. If plaintiff was entitled to rescind his stock purchase he was entitled to recover what he paid therefor. Reimbursement was not denied on the ground that defendants did not have funds wherewith to do it, but because they were not legally responsible for the misrepresentations which induced plaintiff to purchase the shares of stock. While there may not be any direct testimony flatly disputing some of the facts embodied in the finding, the necessary deductions from the evidence are to the contrary. Certain it must be

that a bank cannot do business for 15 weeks without some change in the amount of the claims of its creditors. It appears that 10 per cent in amount did not sign the composition agreement. It is fair to assume that these demands were promptly paid when the bank reopened. It also is shown that the school and county depository funds in the bank on April 8, 1925, were paid. While cash on hand when the reorganized bank opened on November 9, 1925, was in round numbers $60,000, it was only about $22,000 when the bank commissioner took it over on February 23, 1926. Nor is it perceived how this part of the finding can be sustained, viz:

"That the depositors and unsecured creditors * * * in no way suffered any damage whatever by reason of the reorganization, reopening or closing of the bank, but on the contrary they profited thereby in not less than the sum of $37,500, being the amount paid into the bank for the new stock."

True, by the cancelation of the old stock and the sale of the new $37,500 cash was acquired. But it is rather clear that no part thereof has gone to the creditors now existing, except in so far as payments of those of April 8, 1925, have reduced the total debts of the bank and to that extent benefited those remaining on February 23, 1926.

There is another situation which so far as this record discloses may prejudicially affect creditors. The stockholders are not the same; for the record indicates that some of the stockholders who surrendered their stock did not take new stock, and that others did not buy the same number of shares they held before. If the old stock was canceled the stockholders' double liability went with it. It is clear that it cannot be said on this record that the creditors are not prejudiced by the shift of the stockholders' double liability from those holding the old issue to those holding the new.

Aside from what has just been stated, the finding of fact above quoted does not support the conclusion of law that the plaintiff's stock should be canceled. He subscribed and paid for the stock. He based his right to have the same rescinded upon fraud and misrepresentation. The only finding as to that issue is this:

"That plaintiff was induced to purchase the said three shares of stock in the reorganized bank and to pay therefor $450 by and through fraudulent misrepresentations designedly made by persons connected with the failed bank and actively interested in promoting a reorganization thereof and in procuring purchasers of stock in the reorganized bank, and that the defendant commissioner had full knowledge of the activity of said persons in furthering the reorganization plan, but that he was without any information that said persons, either or any of them, were engaged in making reckless representations intended to deceive plaintiff, or that they or any of them made false statements or representations concerning the situation in order to induce plaintiff to become a stockholder in the reorganized bank, and that neither the commissioner nor the bank as reorganized is chargeable with actionable fraud in that respect."

The record is clear that the only one plaintiff and his witnesses claim to have made any misrepresentation whatever was Mr. Zimmerman, the deputy placed in charge of the bank by the commissioner of banks during the latter's custody. Plaintiff does not deny that he was informed by Mr. Zimmerman that he had no authority to make any representations in behalf of the commissioner or anyone else. The testimony is clear that Zimmerman's authority was strictly limited to the duties connected with liquidation and had nothing to do with reorganization. However on this appeal the last quoted finding is not attacked, and we take it as it reads. At that it falls short of supporting the conclusion of law that plaintiff is entitled to rescind. Counsel cite 12 R. C. L. p. 402, § 150. But the last sentence in that section reads:

"The fraud of a third person can give a purchaser of goods no right to rescind, unless the seller in some way becomes a party to the fraud; and even in the latter event the right to rescind grows out of the conduct of the seller and is not based on any relation of the third person to the consideration or the contract, or on any new right in favor of the purchaser against him."

In Nash v. Minnesota T. I. & T. Co. 163 Mass. 574, 581, 40 N. E. 1039, 1041, 28 L. R. A. 753, 47 A. S. R. 489, the court says:

"It is clear that mere fraud of a third party which induces the purchase of goods will not give the purchaser a right to rescind the contract. If the seller is not a party to the fraud, the contract must stand."

Here Zimmerman represented neither defendant in the reorganization and had no authority to speak for either.

We are also of the opinion that defendants were entitled to a finding on the issue of estoppel pleaded. Such a finding was requested. It is difficult to see why there is not an estoppel. The creditors to the extent of 90 per cent of the total amount of the claims signed the composition or reduction agreement, the stockholders' liability upon the old stock was canceled in reliance upon the new stock purchased by plaintiff and others, and the reorganized institution paid in full at least some of the creditors who refused to sign the composition agreement. The committee of reorganization, which acted for plaintiff in passing upon the $117,000 in bills receivable, did not claim to have been induced to accept the same as good bankable paper because of any misrepresentation or fraud of the former stockholders or officers of the bank or of Veigel. The cases of Rathbun v. Goldman, 164 Minn. 507, 205 N. W. 436, and Chippewa County State Bank v. Kief, 172 Minn. 412, 215 N. W. 833, are not in point, but rather Henderson v. Crosby, 156 Minn. 323, 194 N. W. 641, and the authorities therein referred to.

The order is reversed.